FILED

2015 Aug-21  AM 10:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SPINA MARKETING SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:14-cv-00330-JEO |
| | ) | |
| J. MICHAEL MCFADDEN, | ) | |
| MICHAEL G. O'MARA and | ) | |
| MERIDIAN ENERGY GROUP, LLC., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This action involves a business dispute between Spina Marketing Services, Inc. ("Spina Marketing") and J. Michael McFadden, Michael G. O'Mara and Meridian Energy Group, LLC (collectively "the defendants"). The defendants have moved for summary judgment on Spina Marketing's claims. (Doc. 11). Spina Marketing has moved to strike the reply brief of the defendants as it is untimely. (Doc. 17). The motions are fully briefed. The court finds that the motion to strike is due to be denied and the motion for summary judgment is due to be granted in part and denied in part.

## I.   FACTS[1]

Rick Spina ("Spina"), the President of Spina Marketing, had a long term relationship with Belle Foods ("Belle") and its predecessors.  (Spina Dep. at 17).[2] Belle used Spina Marketing for remodeling and re-branding its stores.  (*Id*.)  Spina Marketing was in charge of painting the stores, obtaining new signage, refurbishing the food display cases, and installing LED lighting.  (*Id*.)

Spina Marketing did its first work for Belle in June 2012, remodeling and installing lighting at Belle's Hoover store.  (*Id*. at 19).  Spina Marketing did additional remodeling and lighting work for Belle at its stores in Florence, Tuscaloosa, Mobile, Brewton and Alabaster, Alabama and Athens, Georgia.  (*Id*. at 19, 23).  The projects were intended to make the stores look better and be more energy efficient.  (*Id*. at 21).  Typically, the renovation process was commenced with Spina Marketing quoting a price for certain work.  (*Id*. at 23).  Belle would accept via a purchase order.  (*Id*.)  Spina's primary contact at Belle was Greg Triola ("TRiola"), the Director of Real Estate Construction.  (*Id*. at 24; Triola Dec.

---

[1]The facts in this section are set forth as discerned by the court from the pleadings and the parties' respective evidentiary submissions, in light of the summary judgment standard requiring that the record be viewed in the light most favorable to the nonmoving party.  Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts.  *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

[2]Spina's deposition is located at document 13-1 to 13-3.  Page references are to the numbers assigned by the court reporter.

at 1).[3]

In September 2012, while Spina Marketing was working at the Belle store in Tuscaloosa, Alabama, Defendant J. Michael McFadden ("McFadden") approached William White ("White"), the President of Belle, with a proposal to fund the purchase and installation of energy-saving lighting so long as Belle would share the subsequent electricity cost savings with Boyd Energy Group ("Boyd"). (White Dec. at 2).[4] McFadden represented that he was working for Boyd at that time. (*Id*.) However, records from the Florida Secretary of State demonstrate that Boyd did not exist at this time. (Doc. 15-6 at 2 (Ex. J)). It was not formed until October 16, 2012. (*Id*.)

White introduced McFadden to Triola. (White Dec. at 3). McFadden explained to Triola "that they would provide the funds for the purchase and installation of energy saving projects specifically including the lighting in this instance [the Tuscaloosa project] and they would be repaid by sharing the energy savings costs with the customer." (Triola Dec. at 3; White Dec. at 2-3). Based on McFadden's representations about funding, Belle expanded the number of

---

[3]Triola's declaration is located at document 15-3. Page references are to the electronic numbers at the top of the document.

[4]White's declaration is located at document 15-4. Page references are to the electronic numbers at the top of the document.

proposed projects to be undertaken.  (White Dec. at 5).  McFadden told Triola to have Spina Marketing's invoices billed to Boyd instead of Belle.  (*Id*. at 2).

Triola told Spina that McFadden would call him about the deal.  (Spina Dep. at 42; Triola Dec. at 3).  According to Spina, McFadden contacted him and said that, via Defendant Meridian Energy Group, LLC ("Meridian")[5], they would finance the purchasing of the products for the Belle projects up front and would pay Spina Marketing for its labor as the jobs were completed.  (Spina Dep. at 42-45, 59).  This was consistent with what Triola had told Spina.  (*Id*. at 43; Triola Dec. at 2).  McFadden also told Spina that Belle wanted Spina Marketing to continue the change-out to LED lighting in the stores.  (Spina Dep. at 44).  Spina was told to bill the Tuscaloosa invoices to Boyd rather than Belle.  (Spina Dec. at 3).[6]

Spina subsequently contacted McFadden by email and requested financial information and the terms of their understanding.  McFadden responded "by stating that materials would be paid for in advance and labor would be paid for

---

[5]Meridian was not formed until November 20, 2012.  (Doc. 15-7 at 1-8).  McFadden was listed as the managing member, the registered agent, and the authorized representative submitting the Articles of Incorporation.  (*Id*.)  Defendant Michael G. O'Mara ("O'Mara")was listed as the contact person.  (*Id*. at 5 of 8).  McFadden made O'Mara a managing member on April 15, 2013. (*Id*. at 8 of 8).

[6]Spina's declaration is located at document 15-5.  The page numbers are to the electronic numbers at the top of the document.

upon completion by his company.  He also informed [Spina] that his company had the funds to pay for the materials and labor." (*Id*.)  Specifically, on October 2, 2012, Spina emailed McFadden at his Boyd email address and reminded McFadden that he needed "your company info/credit, for billing etc." on the Tuscaloosa project.  (Doc. 15-8 at 2 of 27 (Pl. Ex. 1); Spina Dep. at 47).

McFadden responded as follows:

> If the project makes sense for Belle-Foods and they go forward we will pay for the equipment up front.  The only thing we carry until completion is your installation costs.  In our Energy Investment Program the client puts up no capital, the energy savings pays (sic) for the equipment over times (sic).  All sub contractors are fully paid on competition of the project.  I will get back to you [after] I talk to Greg.

(Doc. 15-8 at 2 of 27 (Pl. Ex. 1)).  Spina replied, "Sounds good, thanks."  (*Id.*)[7]

Spina Marketing initially invoiced Boyd as directed.  (*See* Doc. 13-6 at 46 (Pl. Ex. 3) (10/24/2012 Invoice)).  Thereafter, Spina was told by McFadden to bill Meridian, not Boyd, going forward on the Tuscaloosa project.  (Spina Dep. at 25-30; McFadden Dep. at 62).[8]

About this time, on October 5, 2012, there was a meeting in Mobile,

---

[7]The court notes that the email chain on October 2, 2012, is confusing, because the emails do not appear to be in chronological order, at least as they are presented on Plaintiff's Exhibit 1.

[8]McFadden's deposition is located at document 13-4 to 13-6).  The page numbers are to the court reporter's numbers on the deposition.

Alabama that White, McFadden, and someone from Pemco Capital ("Pemco")[9] attended.  White recalled being introduced at that meeting to a person who was identified as working with Meridian.  (White Dec. at 4). According to White, there were no requests for financial information at the meeting, and he did not recall "any mention that the payment for the work or the performance by Mr. McFadden was contingent upon any separate funding from a third party." (*Id.*)  According to White, funding did not become an issue "until after the work was well on its way and almost completed." (*Id.*)

On October 24, 2012, at 7:01 p.m., Spina received an email confirming that Belle was going forward on the projects.  (Spina Dep. at 30, 49).   Spina Marketing began installing the equipment.  (Spina Dep. at 50-51).   Spina Marketing invoiced Meridian for the costs and the labor as directed.  (McFadden Dep. at 52; Doc. 13-3 at 20 to 45 (Exs. C-G)).  About half of the invoices are for work done on or before November 16, 2012.  Meridian did not contest the invoiced work or amounts.[10]  (McFadden Dep. at 52-53).  However, Spina

---

[9]Pemco Capital is also cited as PEMCO in the record.  For consistency, the court will refer to it as Pemco herein.

[10]O'Mara did request later that the name on the invoices be changed to Pemco and then back to Meridian.  (Spina Dep. at 36).  The only other matter for discussion at that time was whether there was to be a 15% add-on to the invoices for the services of Meridian.  (*Id.* at 35-36; Def. Ex. 2 (Doc. 13-3 at 41 of 44)).

Marketing was not being paid for the supplies as promised.  (Spina Dep. at 51).

McFadden considered Spina Marketing as a creditor and carried the debt on

Meridian's accounts payable list.  (*Id*. at 103).

Sometime after Thanksgiving 2012, White was contacted by McFadden,

who requested financial information from Belle so that he could obtain financing

for the projects from Pemco.  (White Dec. at 4).  This was the first time Pemco

was mentioned to White as the funding source for the projects.  (*Id*.)  Spina also

testified that Pemco came into the picture around November 2012.  (Spina Dep. at

31).  Spina believed they – Boyd, Meridian, and Pemco – "were all one and the

same."  (*Id*.)

Despite not being paid, Spina Marketing kept working because Spina was

being told that he would be paid by Meridian within "the next day or the next

week or whatever."  (*Id*. at 51).  Spina asked Triola to help with the situation of

not being paid.  (*Id*. at 37, 51).  Triola told Spina he would try to call White or

someone at Meridian to see what he could find out.  (*Id.* at 37).

On December 12, 2012, O'Mara contacted Spina, informing him that he

(O'Mara) was the chief financial officer of Meridian.  (Spina Dep. at 67-68, 72).

O'Mara sent Spina a email with a contract identifying Spina as a subcontractor and

requesting that Spina sign the same. (Pl. Ex. 5).  The email referenced that

7

O'Mara believed that Belle and Pemco had signed the finance agreement and that "[f]unding/[p]ayment was expected next week." (*Id*.)  Spina signed the agreement, but Spina Marketing still was not paid.  (Doc. 13-6 at 49 of 50 (Pl. Ex. 6)). O'Mara and Spina also talked about revising various invoices to reflect a 15% add-on for Meridian's services.  (*Id*. at 68-71, 75; Doc 13-7 at 4 of 27 (Pl. Ex. 8); Doc. 13-3 at 41-42 of 44 (Def. Exs. 2 & 3)).

By December, Spina was asking questions on a daily basis about the money Spina Marketing was owed.  (Spina Dep. at 31-32).  Spina Marketing stopped working after completing jobs on December 13, 2012.  (*Id*. at 52).  Spina Marketing refused to do any further jobs without payment up front and payment of the past due amounts.  (*Id.*)

In late December or early January 2013, Triola finally learned and conveyed to Spina that the problem was with the financing at Pemco.  (*Id*. at 37-38).  In January 2013, after finally receiving contact information from McFadden, Spina contacted Josh Heald at Pemco.  (*Id*. at 32-33, 96).  They talked around January 17, 2013.  (*Id*. at 97).  Heald told Spina that they (Pemco) were waiting on some financial information from Belle and that they would be closing the transactions on seven stores and the outstanding invoices would be paid.  (*Id*. at 98).  Heald updated Spina on January 26, 2013, that everything was looking good.  (*Id*. at 98-

99).  At some later time, however, Heald informed Spina, as well as others, that he was not going to fund the deals and he "wished [them] well."  (*Id*. at 113-14).  As late as May or June 2013, McFadden and O'Mara were still attempting to find funding for the Belle projects.  (*Id*. at 117-19).

McFadden transferred his interest in Meridian to O'Mara on April 25, 2013, after he was indicted on criminal charges.  (McFadden Dep. at 64-65).

Belle filed for bankruptcy protection on October 17, 2013.  (Doc. 13-12 at 1).  Spina Marketing filed a proof of claim and an addendum thereto in the amount of $319,565.00.  (*Id*. at 3).

## II.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, a party is authorized to move for summary judgment on all or part of a claim asserted against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats &*

9

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.  Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A), (B).  In its review of the evidence, a court views the evidence in the light most favorable to the non-movant.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.   MOTION TO STRIKE

Spina Marketing argues that the defendants' reply brief is due to be struck because it was not filed timely in accordance with the court's Uniform Initial Order.  (Doc. 17).  The defendants respond that the reply brief was filed before the motion for summary judgment was ruled on, it merely responds to points raised by

Spina Marketing and does not raise any new grounds or arguments, Spina Marketing has not been prejudiced, and the brief will be helpful to the court in deciding the motion for summary judgment.  (Doc. 18).

A ruling on a motion to strike is committed to the discretion of the trial court.  *See Hernandez v. Sec. Fla. Dept. of Corrections*, – F. App'x – , 2015 WL 2388302, n.2 (11th Cir. May 20, 2015) (finding no abuse of discretion on ruling on motion to strike certain evidence); *Ramirez v. E.I. DuPont de Nemours & Co*., 579 F. App'x 878, 882 (11th Cir. 2014) (holding that the lower court did not abuse its discretion in denying motion to strike testimony); *see also King v. Chubb & Son*, 563 F. App'x 729, 732 (2014) ("We review a district court's ruling on a motion to strike untimely evidentiary filings for abuse of discretion....  As long as the district court has not committed a clear error of judgment, we will affirm its ruling."); *Miele v. Certain Underwriters at Lloyd's of London*, 559 F. App'x 858, 860 n.1 (11th Cir. 2014) ("We review a district court's denial of a motion to strike for an abuse of discretion.  *Telfair v. First Union Mortg. Corp*., 216 F.3d 1333, 1337 (11th Cir. 2000)").

Even though Spina Marketing's arguments are on point and the defendants have not offered an explanation for the late filing of their reply brief, the court finds that the interests of justice warrant consideration of the same.  This is

particularly true where the court sees no prejudice to Spina Marketing.  The

motion is due to be denied.

## IV.   DISCUSSION

Spina Marketing's complaint includes claims for "open account" (Count I),

"account stated" (Count II), fraudulent misrepresentation (Count III), fraudulent

concealment of material facts (Count IV), fraudulent inducement (Count V),

breach of contract (Count VI), and tortious interference with contractual relations

(Count VII).  (Doc. 10-1).  The defendants have asserted a multi-faceted challenge

to the complaint.  (Doc. 11).  Each challenge will be addressed below.

### A.   Claims Against the Individual Defendants

Defendants McFadden and O'Mara initially assert that all of Spina

Marketing's claims against them are due to be dismissed because there is no basis

for individual liability and there is no justification for piercing the corporate veil.

(Doc. 12 at 4-8).  Spina Marketing responds that this aspect of the motion is due to

be denied because McFadden's conduct demonstrates his disregard for corporate

structure.  (Doc. 15 at 9-12).

The applicable law is well-established:

> "In certain situations the corporate entity will be disregarded
> and limited stockholder liability will be denied.  The following
> factors are commonly used as justification for 'piercing the corporate

veil' and imposing personal liability on shareholders or imposing liability on a controlling corporation: 1) inadequacy of capital; 2) fraudulent purpose in conception or operation of the business; 3) operation of the corporation as an instrumentality or alter ego. *Piercing the Corporate Veil in Alabama: In Search of a Standard*, 35 Ala. L. Rev. 311 (1984).

> "Initially, we note that it is under the third theory that [the plaintiffs] contend[ ] that the corporate entity should be disregarded. Alabama law has recognized that in proper situations, when the corporate form is being used to evade personal responsibility, the corporate form will be disregarded and liability will be imposed on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality. *Cohen v. Williams*, 294 Ala. 417, 318 So. 2d 279 (1975). Although the limitation of personal liability is a valid corporate attribute, the corporate entity will be disregarded when it is used solely to avoid a personal liability of the owner while reserving to the owner the benefits gained through use of the corporate name. *Bon Secour Fisheries, Inc. v. Barrentine*, 408 So. 2d 490 (Ala. 1981) (citing *Woods v. Commercial Contractors, Inc.*, 384 So. 2d 1076 (Ala. 1980))."

*Culp v. Economy Moble Homes, Inc.*, 895 So. 2d 858, 859-60 (Ala. 2004) (quoting

*Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987)).

In support of its argument, Spina Marketing asserts that McFadden "clearly originally contracted with the parties using an entity name that did not exist at the time." (Doc. 15 at 11). The defendants do not dispute this. Instead, they retort that (1) Spina Marketing knew that neither McFadden nor O'Mara ever agreed to be individually responsible on the transactions; (2) Spina Marketing never

requested personal guarantees from McFadden or O'Mara; (3) Spina never insisted on receiving the credit information he requested for Meridian from McFadden; and (4) under-capitalization of an entity alone is not sufficient to establish personal liability on the part of McFadden and O'Mara.  (Doc. 16 at 1-6).

The court finds that summary judgment as to individual liability on the part of McFadden is due to be denied for at least two reasons.  First, McFadden did misrepresent the existence of Boyd and Meridian in his dealings with Belle and Spina Marketing.  Neither corporation existed until well after he started using their alleged existence to his benefit in dealing with Belle and Spina Marketing.  Second, because the corporations did not exist when McFadden was positing their existence, there was no capitalization to support either entity.  Even after the entities were formed, it is evident from the record that there was no underlying financial support or capitalization.  This is particularly troubling because of the representations McFadden was making with regard to funding the work that was to be done and was already being done by Spina Marketing.

Under the circumstances and the law, particularly that the court must look at the evidence in the light most favorable to Spina Marketing, the court finds that the motion for summary judgment is due to be denied as to McFadden.  His actions squarely fit within the third theory enumerated above for "piercing the

14

corporate veil," where an individual attempts to use the operation of the corporation as an alter ego and to avoid personal liability.

O'Mara, however, is a different story.  He did not make the representations that McFadden made.  He did not induce Spina to act while representing that Boyd and Meridian existed before they were formed.  By the time Spina began talking with O'Mara, the work was mostly accomplished.  The agreement O'Mara emailed to Spina specifically referenced Pemco.  While O'Mara did indicate he would do all he could to get Spina paid, he never personally guaranteed the payment.  (Spina Dep. At 74-75).  Moreover, he was not a managing member of Meridian until April 2013.  Accordingly, summary judgment is due to be granted in favor of O'Mara as to any claim premised on his individual liability via "piercing the corporate veil."

## B.    Open Account

Spina Marketing claims Meridian owes it $319,565.00 on "open account." (Doc. 1-1 at ¶ 19).  The defendants argue that "open account is inapplicable" because "Spina [Marketing] is claiming that a sum certain is due and does not allege any provisions of an oral or written contract remaining to be determined." (Doc. 12 at 9).  Spina Marketing counters that the contract between it and the defendants "had terms which were left open.  Those terms were subsequently

completed as a result of performance.  The amount of payment and integral terms regarding the exact work to be performed were left open.  Thus the contract between Spina [Marketing] and the [d]efendants was an open account."  (Doc. 15 at 12).

"An open and unliquidated account is one where a provision of the contract is left open for further negotiations."  *Wal-Mart Stores, Inc. v. Anniston Dev. Co*., 853 So. 2d 218, 221 (Ala. 2002).  Stated another way, "A contract which is definite in all of its terms, when nothing, under the terms of the contract, is left for future adjustment, whether it be evidenced by a writing or not cannot be considered a mere open account."  *Id*. at 220 (quoting *Union Naval Stores Co. v. Patterson*, 179 Ala. 525, 529, 60 So. 807, 808 (1912)).

On the evidence before the court, it cannot find on summary judgment that the agreement between the parties was not "a mere open account."  The best evidence of this is the discussion between Spina and O'Mara about the fifteen percent "add-on" for Meridian's services.  That term was clearly up for discussion during the latter part of the relationship between Meridian and Spina Marketing.

The defendants assert that because Spina Marketing now claims a sum certain is due, a "claim for money due by open account is inapplicable and fails to state a claim."  (Doc. 12 at 9).  The defendants do not cite any authority for this

16

proposition.  The court does not believe that Spina Marketing's demand in this action for a sum certain warrants the granting of summary judgment on its claim for money due on open account.

### C.    Account Stated

In contrast to an open account, "[a]n account stated is an agreement between parties who have had previous monetary transactions that the statement of account and the balance struck are correct and a promise, express or implied, that the debtor will pay that amount." *Lemoine Co. of Alabama, L.L.C. v. HLH Constructors*, 62 So. 3d 1020, 1029 n.7 (Ala. 2010) (quoting *Gilbert v. Armstrong Oil Co.*, 561 So. 2d 1078, 1081 (Ala. 1990)).  The Alabama Court of Civil Appeals discussed this type of claim in *Mahoney v. Loma Alta Prop. Owners Ass'n, Inc.*, 4 So. 3d 1130, 1134-35 (Ala. Civ. App. 2008):

> In *Ayers v. Cavalry SVP I, LLC*, 876 So.2d 474 (Ala. Civ. App. 2003), this court discussed the nature and elements of an account-stated claim:
>
> > " 'An account stated is a post-transaction agreement.  It is not founded on the original liability, but is a new agreement between parties to an original account that the statement of the account with the balance struck is correct and that the debtor will pay that amount.  It is as if a promissory note had been given for the balance due.
> >
> > " 'A prima facie case on an account stated is made when the plaintiff proves (1) a statement of the account

17

between the parties is balanced and rendered to the
debtor; (2) there is a meeting of the minds as to the
correctness of the statement; and (3) the debtor admits
liability.  The debtor's admission to the correctness of
the statement and to his liability thereon can be express
or implied.  An account rendered, and not objected to
within a reasonable time becomes an account stated, and
failure to object will be regarded as an admission of
correctness of the account.' "

876 So. 2d at 477 (quoting *University of South Alabama v. Bracy*, 466
So. 2d 148, 150 (Ala. Civ. App. 1985)).  "An 'account' is a general
term which covers an item of indebtedness, by contract, express or
implied."  *Dees v. Self Bros.*, 165 Ala. 225, 228, 51 So. 735, 736
(1910) (emphasis added).  *See also  Morrisett v. Wood*, 128 Ala. 505,
507, 30 So. 630, 631 (1900) (stating that an account arises "out of
contract or some fiduciary relation" between the parties).

Here, the defendants argue that "there has been no written statement of a

balance due agreed to by the parties, and no meeting of minds nor admission of

liability by the defendants."  (Doc. 12 at 10).  Spina Marketing retorts that it

"invoiced the [d]efendants on numerous occasions under the names provided by

[them and they] requested only that the invoices be re-written by changing the

desired name to be placed on the invoice."  (Doc. 15 at 13).  Spina Marketing goes

on to conclude that all of the defendants "received the statement of account,

agreed to the statement ..., and admitted that the debt was owed.  The only

question ... was whether PEMCO would fund the projects."  (*Id.*).

The court cannot conclude that the defendants have admitted liability on the

balance owed even if the balance is presumed correct under the circumstances. Accordingly, the defendants are entitled to summary judgment on Spina Marketing's claim for account stated.

### D.    Fraudulent Misrepresentation or Concealment

The defendants assert that no fraudulent representations were made to Spina Marketing.  They premise their assertion on four grounds: (1) O'Mara and Spina talked only about invoices, after Spina Marketing's work had already been completed; (2) Spina's testimony demonstrates that he did not rely on the representations of the defendants; (3) the defendants had no duty under the circumstances to disclose the source of the funding; and (4) the defendants were misled by Belle and Pemco just like Spina.  (Doc. 12 at 11-14).  Spina Marketing responds that the defendants falsely represented that Boyd and then Meridian had sufficient funds to pay Spina Marketing for its work.  (Doc. 15 at 14-15).  Spina Marketing asserts that the defendants failed to disclose "that there was a condition precedent to their ability to perform."  (*Id*.)

The law in Alabama is clear:

A fraudulent-misrepresentation action is governed by § 6–5–101, Ala. Code 1975, which provides that "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."  A claim of

> fraudulent misrepresentation comprises the following elements: "(1) a
> false representation (2) concerning a material fact (3) relied upon by
> the plaintiff (4) who was damaged as a proximate result." *Fisher v.*
> *Comer Plantation*, 772 So. 2d 455, 463 (Ala. 2000) (quoting *Baker v.*
> *Bennett*, 603 So. 2d 928, 935 (Ala. 1992))....

*Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 656 (Ala. 2014).  The Alabama courts have

made it clear that a plaintiff in such a case has a "duty to inquire and investigate."

*See Alfa Life Ins. Corp. v. Reese*, – So. 3d –, 2015 WL 3964215, *11 (Ala. 2015)

(quoting *Alfa Life Ins. Corp. v. Colza*, 159 So. 3d 1240, 1251 (Ala. 2014)).  Also,

generally it is for a jury to decide whether it was reasonable for a plaintiff to rely

upon the representations of the defendant.  *See Target Media Partners Operating*

*Co., LLC v. Specialty Marketing Corp.*, – So. 3d –, 2013 WL 4767022 (Ala. 2013)

("It is not this Court's job to decide the credibility of or to assign weight to

testimony and other evidence of fraud and the reliance that purportedly occurred in

this case.  It was for the jury to decide whether it was reasonable for Specialty

Marketing to rely upon Target Media's and Leader's continual misrepresentations

throughout the four-year term of the 2002 distribution contract.").  Finally,

"plaintiffs alleging fraud cannot be said to have reasonably relied on alleged

misrepresentations when they have been presented with information that would

either alert them to any alleged fraud or would provoke inquiry that would

uncover such alleged fraud."  *Sandoz, Inc. v. State*, 100 So. 3d 514, 527-28 (Ala.

20

2012).

In the present case, the court cannot conclude as a matter of law that Spina Marketing is entitled to no relief on its misrepresentation claim. Spina testified that McFadden represented to him that he would be paid by Meridian "up front" for the equipment/supplies. (Spina Dep. at 50). However, at the time of the representation, Meridian did not exist and did not have the capital to pay for the equipment. McFadden was dependent on outside funding that had not been secured. Looking at the facts in a light most favorable to the non-moving party, McFadden lied to Spina Marketing. As a result of McFadden's misrepresentations and Belle's commitment to proceed, Spina Marketing went forward with the deal. The motion for summary judgment is due to be denied as to this claim.

To the extent the defendants argue that O'Mara and Spina talked only about invoices and that Spina Marketing "obviously did not rely upon any representation by O'Mara" because its work had already been completed, the court finds that this myopic view ignores the foregoing specific representation by McFadden. (Doc. 12 at 11). As a part of this contention, the defendants also assert that Spina Marketing became aware of Pemco's involvement "prior to some of the installations for which Spina [Marketing] is claiming damages" and, therefore, "Spina [Marketing] could not have relied on the alleged misrepresentations in

providing materials and labor after that date, nor in signing the written contract on

December 12, 2014." (Doc. 12 at 12). While this assertion is true, it only impacts

a part of the consideration. Up until Spina learned of Pemco's involvement, he

was relying on the representations of McFadden, which is sufficient to support

Spina Marketing's misrepresentation claim. Additionally, by this juncture, a large

portion of the unpaid work had been completed and invoiced to Meridian.

To the extent the defendants argue that Spina's testimony demonstrates he

did not rely on the representations of the defendants, the court disagrees. Spina

did testify that his decision to proceed with the deal was premised Belle's decision

to proceed. (Spina Dep. at 50). However, he also stated that he relied on the

representations of McFadden that he would be paid up front for the equipment.

(*Id*.) While Spina did not follow up on his request for credit information from

McFadden, that is not dispositivie of the misrepresentation claims in this case.

Under the circumstances, that is a matter for the jury.

To the extent the defendants argue that they had no duty under the

circumstances to disclose the source of the funding, the court might agree

generally. However, that is not the issue; the issue is that McFadden represented

that Meridian would pay the money up front. He did not indicate any contingency

on payment due to third-party financing. To the contrary, in his October 2, 2012

email to Spina, he stated that if the project went forward, "we will pay for the equipment up front." (Doc. 15-8 at 2 of 27 (Pl. Ex. 1)). Spina responded, "Sounds good, thanks." (*Id*.)

Lastly, to the extent the defendants argue that they were misled by Belle and Pemco just like Spina Marketing, the court is not impressed. That may be a matter for the jury, but it does not change the representations made by McFadden to Spina.

In sum, the defendants' various challenges to Spina Marketing's fraud claims are due to be denied. However, in view of the court's findings previously in the section on piercing the corporate veil, it further concludes that for the same reasons, Spina Marketing has failed to overcome O'Mara's motion for summary judgment as to the fraud claims advanced against him in his individual capacity.

## E.    Fraudulent Inducement

Spina Marketing also claims that the defendants' fraudulent representation that funding for the projects was "in place" induced it to provide the materials and labor for the Belle projects. (Doc. 1-1 (Complaint) at ¶ 23). The defendants argue that summary judgment is due to be granted them on this claim because of Spina Marketing's "failure to exercise reasonable diligence to determine the true facts and safeguard its interests." (Doc. 12 at 15).

23

Under Alabama law, "[f]raud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala.2000) (emphasis omitted). Fraudulent inducement claims are governed by the "reasonable reliance" standard. *Harold Allen's Mobile Home Factory Outlet, Inc. v. Early*, 776 So. 2d 777, 783 (Ala. 2000).   As the Alabama Supreme Court explained in *Torres v. State Farm Fire & Cas. Co*., 438 So. 2d 757, 758-59 (Ala. 1983):

> Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests.  In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances.  If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.  *Bedwell Lumber Co. v. T & T Corporation*, 386 So. 2d 413, 415 (Ala. 1980).
>
>> "If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, '*volunti non fit injuria*'."

While it is undisputed that Spina did not follow up on his email to McFadden where he noted that he needed "your company info/credit, for billing,

etc," that inaction does not as a matter of law require the granting of the

defendants' motion for summary judgment on the fraudulent inducement claim.

The defendants have not cited, and the court has not found, any precedent

requiring such under similar circumstances.  Spina's failure to follow up on his

request for information is a matter for the jury's consideration in determining

whether Spina Marketing's reliance on the defendants' representations was

reasonable under the circumstances.  Accordingly, summary judgment is due to be

denied on this claim as to McFadden and Meridian and granted as to O'Mara for

the reasons discussed previously.

### F.   Breach of Contract

Spina Marketing claims that it entered into an oral agreement with the

defendants to provide materials and to perform services at various Belle stores,

and that as a result of a breach of that agreement, it suffered $319,565.00 in

damages.  (Complaint at ¶ 24).  The defendants assert that this agreement violates

the Statute of Frauds, which precludes recovery.  (Doc. 12 at 16).  The Statute of

Frauds provides in pertinent part:

> Except as otherwise provided in this section a contract for the sale of
> goods for the price of $500 or more is not enforceable by way of
> action or defense unless there is some writing sufficient to indicate
> that a contract for sale has been made between the parties and signed
> by the party against whom enforcement is sought or by his authorized

25

agent or broker....

ALA. CODE § 7-2-201(1).  The defendants also assert that the agreement violates
ALABAMA CODE § 8-9-2(3), which provides that any agreement "to answer for the
debt, default or miscarriage of another" is void unless it is in writing.  (Doc. 12 at
17).  Spina Marketing retorts that the parties' agreement is not a contract for the
sale of goods or for the payment of the debts of another.  It asserts that the
agreement is a "subcontract agreement" that is not subject to either statute.  (Doc.
15 at 18-19).

   The court finds that the agreement between Spina Marketing and the
defendants was akin to a subcontractor agreement where the subcontractor is
reimbursed for the goods provided and the labor rendered.  It is not a contract for
the sale of goods that falls within § 7-2-201(1).  It also does not fit within the
requirements of § 8-9-2(3), requiring that there be a writing when a party agrees
"to answer for the debt, default or miscarriage of another."  In this instance, the
defendants made an original agreement to pay for equipment purchased by Spina
Marketing for use in Belle stores, to pay for Spina Marketing's services, and to be
paid out of the energy cost savings from the renovations.  This interpretation is
consistent with McFadden's email of October 2, 2012, confirming that equipment
is paid for "up front" and that subcontractors are paid upon completion (Doc. 13-6

at 29 of 50 (Pl. Ex. 1)), and with the parties' execution of a written contract on December 12, 2012, titled "Master Subcontract Agreement," which identified Spina Marketing as a subcontractor (Doc. 13-12 at 6 of 30 (Def. Ex. A)). This arrangement is not a contract for the sale of good under § 7-2-201(1), and it is not a collateral agreement to pay the debt of another, which would be covered by § 8-9-2(3).[11]

Similarly, because the Statute of Frauds is not applicable in this instance, Spina Marketing's tort claims are not precluded, either.

### G. Tortious Interference with Contract

Spina Marketing also alleges that it had a contractual relationship with Belle to purchase and install equipment and that the defendants tortiously interfered with that relationship. (Complaint at ¶ 25). The defendants assert that they are entitled to summary judgment on this claim because they did not interfere with any project for which Spina Marketing had issued a bid and received a purchase order;

---

[11]In Alabama

" ' "Collateral" agreements are those in which the object of the promise is to become the guarantor of another's debt; these are within the statute [of frauds] and must be in writing to be enforceable. "Original" agreements are those in which the effect of the promise is to pay the debt of another, but the object of the promise is to promote some purpose of the promisor.'

*Boyington v. Bryan,* – So. 3d –, 2014 WL 4055346 (Ala. Civ. App. 2014) (quoting *Fendley v. Dozier Hardware Co*., 449 So. 2d 1236 (Ala. 1984) (citations omitted)).

their involvement in the transactions in dispute was justified; and they were not a stranger to the contract.  (Doc. 12 at 19-22; Doc. 16 at 13-14).  Spina Marketing retorts that it had an ongoing relationship with Belle that was improperly impacted by the defendants' interference and that the defendants were not justified in interfering.  (Doc. 15 at 21-23).

The elements to establish tortious interference with a contractual or business relationship are as follows:

> 1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference.

*Waddell & Reed, Inc. v. United Investors Life Ins. Co*., 875 So. 2d 1143, 1153 (Ala. 2003) (quotations and citations omitted).  Justification for interference is an affirmative defense to be pleaded and proved by the defendant.  *Id*.  The Alabama Supreme Court has also stated:

> "After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." *Atlanta Market Ctr. Management Co. v. McLane*, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); *see also Alcazar Amusement Co. v. Mudd & Colley Amusement Co*., 204 Ala. 509, 86 So. 209 (1920). This is so, because

28

"a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." *Lolley v. Howell*, 504 So. 2d 253, 255 (Ala. 1987).

" ' "One is not a stranger to the contract just because one is not a party to the contract...." *McLane*, 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added [in *BellSouth Mobility*]). As we recently stated in *Colonial Bank v. Patterson*, 788 So. 2d 134 (Ala. 2000): "[W]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized." '

"*BellSouth Mobility* [*v. Cellulink, Inc.*], 814 So. 2d [203,] 212 [(Ala. 2001)]."

Clearly, a party to a contract or a business relationship cannot be liable for tortious interference with that contract or business relationship. *Colonial Bank v. Patterson*, 788 So. 2d 134, 137 (Ala. 2000); *Ex parte  Blue Cross & Blue Shield, Inc.*, 773 So. 2d 475, 480 (Ala. 2000). *Parsons* [*v. Aaron*, 849 So. 2d 932 (Ala. 2002)] makes it clear that a plaintiff asserting a tortious-interference claim bears the burden of proving that the defendant is a "third party" or "stranger" to the contract or business relationship with which the defendant allegedly interfered. See also *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 212 (Ala. 2001). A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship. *Parsons*, 849 So. 2d at 937; *BellSouth*, 814 So. 2d at 214; *Colonial Bank*, 788 So. 2d at 139; *Blue Cross*, 773 So. 2d at 480.

*Waddell & Reed*, 875 So. 2d at 1154.

The issues surrounding Spina Marketing's tortious interference claim are

more difficult because of the muddled facts in this case.  To the extent that Spina

Marketing had not been paid for work performed before McFadden and Meridian

arrived on the scene and Belle instructed Spina Marketing to redirect its invoices

to the defendants, Spina Marketing has demonstrated the requisite elements of a

tortious interference claim.  This includes the work done at the Tuscaloosa store.[12]

With regard to work going forward after the defendants appeared on the

scene, Spina Marketing has not demonstrated all of the requisite elements to

support its claim.  Spina Marketing has demonstrated that it had a business

relationship with Belle, that McFadden and Meridian had knowledge of the

relationship, that they "interfered" with the relationship, and that it (Spina

Marketing) sustained damages.  The defendants, however, argue that they were

"justified" in  competing for Belle's business.  (Doc. 16 at 14).  Specifically, they

argue that "Meridian's analysis and recommendations included 10-15 energy

efficiency improvements, including lighting, refrigeration, HVAC and other

equipment," while "Spina [Marketing] provided LED lighting only" and no

---

[12]The court's reasoning also applies to any project where Spina Marketing had an existing purchase order that was cancelled.  As best this court can discern from the record, there was one existing purchase order that was reissued under new terms (e.g. invoicing Meridian instead of Belle for payment) as a consequence of the defendants' purported actions.  (*See* Spina Dep. at 26-27).  While the defendants argue there was no interference because the work was still performed by Spina Marketing (*see* doc. 12 at 21), there was interference with the terms of the original agreement concerning billing and payment.

"analysis of the energy cost savings for its lighting improvement."  (Doc. 12 at 21).  The court finds the defendants did have a right to compete for Belle's future business involving its other stores.  Accordingly, those activities cannot support Spina Marketing's tortious interference claim.  Summary judgment is due to be granted as to this part of the claim concerning all the defendants.

### H.    Judicial Estoppel

Lastly, the defendants argue that because Spina Marketing filed a claim in Belle's bankruptcy proceedings in the amount of $319,565.00 for its provision and installation of LED lighting at various Belle stores that are the subject of this lawsuit, it cannot now seek to recover the same amount from Meridian for the same materials and labor.  (Doc. 12 at 23).  They assert that Spina Marketing's "bankruptcy claim, under oath, that Belle Foods was liable for payment for the materials and labor is inconsistent with its claim that Meridian now owes Spina [Marketing] for the same materials and labor."  (*Id*.)  The defendants deem this to be "[i]ntentional manipulation" as Spina Marketing "clearly has changed positions deliberately according to the exigencies of the moment, and its claims against the defendants should be held to be judicially estopped."  (*Id*.)  Spina Marketing counters that judicial estoppel is inapplicable.  (Doc. 15 at 23-24).

The law concerning judicial estoppel is well-established:

The purpose of judicial estoppel is to protect the integrity of the judicial process by preventing parties from taking inconsistent positions according to the exigencies of the moment.  *Robinson v. Tyson Foods, Inc*., 595 F.3d 1269, 1273 (11th Cir. 2010) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  In *New Hampshire v. Maine*, the Supreme Court identified three factors that generally inform when judicial estoppel may be invoked: (1) whether the present position is clearly inconsistent with the prior position; (2) whether the party persuaded the court to accept the earlier position, such that acceptance of the inconsistent position would create a perception that the court was misled; and (3) whether the party advancing the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party.  532 U.S. at 750-51.

We employ a two-factor inquiry, requiring a showing that (1) the allegedly inconsistent positions were made under oath in a prior proceeding, and (2) the inconsistencies were calculated to make a mockery of the judicial system.  *Robinson*, 595 F.3d at 1273.  We have held that our two-factor approach is consistent with the principles announced in *New Hampshire v. Maine.  Burnes v. Pemco Aeroplex*, 291 F.3d 1282, 1285-86 (11th Cir. 2002).  To show that a party intended to make a mockery of the judicial system, we require that the contradicting positions be intentional, not merely inadvertent. *Robinson*, 595 F.3d at 1275.

*Anderson v. Brown Industries*, – F. App'x –, 2015 WL 3540378 (11th Cir. 2015).[13]

The court finds judicial estoppel inapplicable for a number of reasons.

First, Spina Marketing's position in this case – seeking to recover from the

defendants on various theories – is not inconsistent with its having filed a claim

---

[13]The parties cite to both federal and Alabama state cases discussing judicial estoppel (*See* doc. 12 at 22, doc. 15 at 24 & doc.16 at 15); however, the result is the same in view of United States Supreme Court precedent on the issue.

against Belle in the bankruptcy proceedings.  Different theories of liability can

support claims against both the defendants in this case and Belle in the bankruptcy

proceedings.  Second, there is no evidence before this court that Spina Marketing

was able to persuade the bankruptcy court to accept its position concerning its

claim.  All that the record in this case demonstrates is that Spina Marketing filed a

proof of claim and an amended proof of claim in the prior proceedings.[14]  (Doc.

13-12 at 1-4).  Third, because the court finds that Spina Marketing's position here

is not inconsistent with its position in the bankruptcy proceedings, there is no

unfair advantage to it or unfair detriment to the defendants.  Fourth, the

undersigned does not see that Spina Marketing has made a "mockery of the

judicial system" through the positions it has advanced in the bankruptcy

proceedings and in this court.  *New Hampshire v. Maine*, 532 U.S. at 750-51.

## IV.   CONCLUSION

Premised on the foregoing, the court finds that the defendants' motion for

summary judgment (doc. 11) is due to be granted in part and denied in part as

stated earlier herein.  Spina Marketing's motion to strike (doc. 17) is due to be

---

[14]Counsel for Spina Marketing does not argue that his position was rejected by the
bankruptcy court, but instead notes that it "was unsuccessful in the prior proceeding to recoup
any of its money."  (Doc. 15 at 24).  Even if the bankruptcy court had accepted its position, Spina
Marketing is not judicially estopped from proceeding on its present claims in this action, for the
reasons otherwise stated herein.

denied.  An appropriate order will be entered contemporaneously herewith.

**DONE**, this the 20th day of August, 2015.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge